May it please the Court. Good afternoon. My name is William Weiner. I'm here for Defendant Moiseev. No, I think you're going to have to speak up. My name is William Weiner, and I'm here representing Defendant Moiseev. I'd like to reserve two minutes for rebuttal, Your Honors. This case really is about the government deceit and the lies of a major witness in the case against Defendant Moiseev. First and foremost, I'd like to mention the government's main witness. You've got to talk into this. Excuse me. His name was Kogan. When you were back there and I watched you before, it kind of reminded me a little of Cesar Romero. A nice suit on. So, you know, for Cesar. Thank you very much, Your Honor. I appreciate that. You have a deep voice and that tends to carry less well in this courtroom. So just hold your mouth close to the mic. Thank you. I will speak up. First and foremost is the perjured testimony of the government's main witness. The government's main witness was a fellow named Kogan. He was the alleged accomplice to the crime. Kogan went on for two full days. The trial was only four or five days. So the main witness, the main time was spent with Kogan. Kogan was involved in the two counts. There was one count having to do with 98. There was one count having to do with the year 2000. Okay. In short, what did Kogan say during his testimony? He lied about his criminal involvement. He lied that he was a thief full time from 96 to 2000. He lied about the fact of his criminal involvement in terms of what he did. He said he stole ten cards. He did that actually reluctantly. And finally he said, well, maybe I stole ten credit cards and a little more. And these are not small points because it allowed the government, through Kogan, to appear that he's a minimal participant. He didn't – The government impeached him on some of those points. The government didn't impeach him on any point as far as I know except one point, and that is he denied whether he was getting as part of his deal the fact that they wouldn't charge him with other crimes. That, indeed – and the government actually didn't impeach him. There was a stipulation between counsel off the record, and that came in, if you call that government impeachment. They never came back. After his cross-examination, the government simply said, Your Honor, we rest. There was no impeachment of their witness, none whatsoever. There was no pointing out – It was during his direct. It was during his cross-examination. During his direct. That's my recollection. Pardon me, Your Honor. The government did it during his direct. It's not my recollection, but if you're correct, that's correct. But the point is it was done, is my recollection, during the cross-examination, but at any rate, it was also done by stipulation where he finally admitted through stipulation. But that was only one point. The lies went much further than that. The point is that the truth was he didn't steal just ten cards and a little more. He stole hundreds of cards, and each card was charged $500 to $10,000. Hundreds of thousands of dollars, if not millions of dollars. But he was there testifying as a small fry, not as a big guy trying to save his skin. His minimizing his conduct resulted in the fact that he was getting a cooperation deal didn't mean that much. If he's a big guy and squawking against everybody, of course it means a great deal. If he's just a small fry, he's not saving himself much time anyway. But here he was saving himself an enormous time. He also lied about his involvement with his girlfriend. He acted in a way that he didn't do anything with his girlfriend. He was in a separate conspiracy with her, stealing, again, credit cards, selling them, fencing them, recruiting people, and so forth. Now, that lie is particularly important because what that lie showed was two things. Again, it minimized his own involvement, that he recruited people, that he did other things, that he did this to his own girlfriend, his dishonesty, his disservice. And instead, what it made him sound like, if anything, very chivalrous. No, I live with her, but she knew nothing about it. I wouldn't involve her in that sort of thing. So the lie was sort of twofold. It made him sound just the opposite. But did the government say, this guy is no Boy Scout, you have to determine the credibility. And the government itself corrected Kogan on several points during direct examinations. That is not my recollection. My recollection is there was one correction, and that had to do with the fact of whether other charges was dismissed. And in closing argument, in the second segment of the close, after defense counsel tried to beat up on Kogan, what the prosecutor did say was, these are our witnesses. This is what Kogan says. This is what the other person says. This is what the other person says. We leave it up to you. What the government didn't say is what the government said to the district judge just weeks later. He lied for two days at Moisev's trial. He lied in significant things and insignificant things. He lied about the hundreds of credit cards. He lies about the $100,000 that he do. The government didn't say that. The government knew it right then at the moment. But that was saved for Kogan. Now to you again, the government signed to push it over to the side. Well, it was that much of a liar. We corrected a few things. It's not that bad. Depending upon the person listening to the government's argument, the argument is different. At Moisev's trial, these are our witnesses. Not he's a liar. At Kogan's sentencing, Kogan is no good liar. He lied for two days. He did all these other things. I won't repeat it. And then before you're on as well, he may not have minimized himself a little bit about his girlfriend's involvement. Otherwise, there was no lies. And that's just not true from the record. I've cited the record and actually have it in the excerpts of record for you. But, you know, it goes on beyond that. What I'm talking about here is government deceit through the case. The defense counsel tried mightily in cross-examination, but all Kogan would say, well, maybe a little more, 10 or a little bit more. That's it. The government has all this information. The government knows he's lying. Defense counsel did really good at cross-examination. And I bring to the Court's attention that lots of times the defense counsel was actually stymied with objections by the government that were sustained. But it's more than that. There was also a Brady submission. And in the Brady submission, and this sort of backs up what I'm saying here, what the government said, and this is a quote from them, and it's on ER 38, is that Exhibit A, literally, this is what it says, quote, contains no material that has anything to do with defendant or Mr. Kogan, nothing to do with them. And then I've brought to the Court's attention four documents, four documents which are important documents. There are others as well, as I've quoted in my opening brief. One of them shows that Kogan wanted to steal with a guy named Bolov right about the time where he said his only partner was Moisev. One of them shows that he said he was working with an Armenian named Marat. That was his partner at the time, stealing and doing credit cards. It may sound like a small thing to you, but on two or three occasions what he said in trial was that he only had two partners, Bokov, who was basically a paid informant by the government, and my poor client. But other than that, he said, I didn't work with anybody else. But it's true right here. He worked with this Armenian named Marat. He tried to work with Bolov. This would have been pointed out, but this wasn't provided to the defense. And more than that, what he said further, and perhaps more importantly, is a year after this case, pardon me, after he was arrested but before the trial, he, he, Bokov, in a phone call, pardon me, he, Kogan, in a phone call to Bokov, still, he's still doing credit cards. That's what he says. I'm still doing credit cards. Do you think that might have been important for the jury to know this guy is still a thief? He's minimizing his activity. He's saying he's not doing anything else, and he's still stealing right after he's caught red-handed. Wouldn't it have been nice for the jury to know, to be enlightened of the fact that this guy is the ringleader, which is what the government told the district court at his sentencing. He recruited everybody. He did everything. He fenced things. He arranged for the merchandise to be stored. He did everything. And what does he do at trial? He said Moisev sold him the Social Security number for the Vineyard card. That was one case. Did the party stipulate that Kogan's restitution amount was higher than your client's? Isn't that correct? Yes. And by doing that, doesn't it tell the jury that he's in the credit card business big time? No, it does not. Just the opposite. Actually, that is a very hurtful stipulation. The stipulation said that Kogan's restitution amount is $42,000. There was nothing about the defendant's restitution that happens at sentencing. But the fact that a matter of $45,000 was not his restitution, as I've just indicated to you, the government told the judge at Kogan's sentencing that he's responsible for between $5,000 and $10,000 per card and hundreds of cards. So if anything, again, it minimized his activity. It tried to show, well, on the one of two cards is $8,000. That was in the present trial. But if you go to ten cards, well, it's $45,000. If anything, it enforced and confirmed the fact that this is a small timer. Ten cards, $45,000. Ten times $4,000. Each of the cards in the Moisev case were around $4,000. It does the opposite of that. It continues to make him a small timer. Everything in this case made him a small timer. And remember, the government told the district judge in that submission, the in-camera submission, Exhibit A has nothing to do, it literally names Kogan and it names my client. But the government said these papers have nothing to do with it. They relate whatsoever to these two people, which is not the case. And that's also the case for portions of Exhibit C, which I'll spare you. So I want to get on the theme, and that's the third point that I'm raising. What about what happened in terms of the subsequent? Not the evidentiary 404 rule, but what happened? The government says, I've got a witness, Detective Deputy Burdock. He's going to say that your client was in a car, stopped, someone else rented the car, that person was in the car, and there was a credit card from Louise Brandt. The defense lawyer, who is not me, the defense lawyer objects. Possession of an unauthorized credit card is not a credit card. Fraud loses. And you've got to tie up the unauthorized possession. Okay, you bring in Louise Brandt, supplement your witness list. Okay, I'll do that. First list, Deputy Burdock. Second list, Deputy Burdock and Louise Brandt. She's going to testify that I didn't authorize anybody to have my card. Fine. Burdock gets on the stand, testifies for quite a long time, a long time in terms of the record. And what does he do? He tells about the stop. He tells where the card was found. He tells all this stuff and so forth. And the card, of course, is not in Moisev's name. The card is in the car with these two people. After that, what does the government do? We rest. Now, talk about a setup. We rest. What about Louise Brandt? No explanation. Louise Brandt doesn't show up. So, of course, defense counsel, what can he do? He says, I move to strike and the judge grants it. Now, if you tell me, well, the judge granted the strike, that's true. But the damage is done. We all know that. It's common sense. This came out. Now, just go back a little bit right in the middle of trial. The defendant says, wait a second. I have testimony that two people tried to set me up in a credit card deal and I refused to do it. Subsequent conduct, going to my intent. I didn't do it. The judge says, no, the subsequent won't come in. Not because the focus of the jury will be somewhere else. No, that's not the reason. That's not anything the judge talks about. Not because it's not a similar. The judge doesn't talk about that at all. Not because there's not enough evidence. The judge never mentions that. The judge mentions one thing. It's subsequent to the event. It won't come in. So it comes in when the defense, when it helps the government. And, of course, in this case it shouldn't have come in. But it doesn't come in when it could help the defendant, which I believe is a Sixth Amendment violation. But also what I'm telling you, Your Honors, is in this case there was deception. That's the third deception. The third obvious deception. We talked just earlier, you had an argument, a case where there was sloppy work done. Let's say it was sloppy work done. But the sloppy work resulted in my client's conviction. There's a perjurer on the witness stand perjuring himself constantly for two days. They say so themselves. They tell the judge this stuff that we're submitting in the camera has nothing to do with these people. It literally names them. They say they're going to have a witness tie up something. They put on the horrible witness, and then they don't tie it up. And now my client's convicted. Well, even if you assume, conceding that Kogan's testimony was perjured, let's concede that, just for argument's sake. Isn't it reasonably likely that your client would have been fouled and guilty based on what I think is rather persuasive evidence as to what Caligo says? He's making telephone calls asking for information, and all that information was helpful if you're going to be in a credit card scam. So isn't there enough there, whether Kogan is a liar or not a liar, there's enough there just based on the evidence of Caligo to convict him? Is that true or false? I don't believe so, Your Honor. I don't believe so because what you have, I think you have to understand, and this was brought out actually in preliminary motions and at trial once again, defense lawyer tried mightily to have Mary Gallegos have a voice identification. That never occurred. She never had a voice identification. Her only testimony was that someone who said his name, Mikhail Moisev, called me, and he asked for the card. That was her testimony. Call from your client's phone. Okay. There's two other things that happened. Yes. If you're asking about Mary Gallegos, just remember she did not identify my client. She just said someone who said that called me. That's number one. So that's off. Number two is it came from Moisev's phone. After very reluctantly Kogan admitted that his girlfriend, the one that he lied about, was my client's wife's sister, and that he and his girlfriend visited my client's home often, right during that period of time. And, again, this is very reluctant. I've cited the pages. You have to read the pages, but he definitely does it. And he says in a different place, the defense counsel is smart enough to ask him at a different time, and you'll use the phone to do this sort of business anywhere. Yes, I will. And then he's asked, and you used the phone at Mr. Moisev's home, and he says no. Now, that's just silly. Of course he would use the phone there for anything. But he says no. So I'm telling you what happened at trial, but the truth is he's there and definitely could make that phone call. So it wasn't your client's credit card used to purchase the information from Mrs. Gallegos. How do you explain that? Exactly the same way. There was access at Moisev's home for that credit card, just like there was. Somebody scammed his credit card and used it? That's right. Is there any evidence to support that? No, there's no evidence whatsoever except the fact that Kogan is a totally fraudulent person who will rat on anybody. He literally implicated his own girlfriend at a trial and then tells the Moisev jury, you know, he's act chivalrous. She didn't know anything. So, yes, I believe he would definitely use that card, and he would definitely make the phone call. All she said was it was a Russian, and Russians called me from the San Francisco Bay Area. My point is that wouldn't be enough. You're focusing on that, but there are lots of other evidence, and most of the evidence was Kogan. That was most of the evidence. And also on your point, that was one count, not the other count. There were two counts he was convicted on. The other count, the only evidence against him is Kogan. And even in that case, Kogan said to Dorch, the investigating officer, that Moisev was along just to buy a table, reluctantly admitting that, but then said, I lied when I told that to Dorch. So that's how that testimony came out. The main evidence against him clearly is this evidence based on, I believe, perjured testimony and deception throughout the trial. I wanted to add one other thing on my sum up before I reserve one point, and that's the Emline case. The only thing I wanted to add to what I submitted to the court, because I don't think it's my main point, so I've argued my main point, is this. The Almendez-Torres case indeed did say, 5-4, that prior convictions you don't have to have a jury trial for. I understand that. However, since then, Apprendi, Justice Thomas, of course, switched roles. So he's on Apprendi on the majority, and, of course, he's on Blakely on the majority. But more importantly, what Blakely said was, other than the fact of a prior conviction, the jury has to find beyond a reasonable doubt. Here it's not a fact of prior conviction. Here it's a fact of a prior conviction happening within ten years, or it wouldn't count at all. Here it's a fact of a prior conviction where he's sentenced to more than 60 days, or it wouldn't give him points. Here it's a fact of a prior conviction happening within two years of this offense, or it wouldn't count. And here's a fact. And when and when he want. Do you want the sentence reduced? Is that what you're saying? Yes. And what practical difference does it make? Isn't he being held by the INS right now? He is, Your Honor. And I'm not sure of this. I've checked with some INS lawyers, and they've indicated to me if his sentence was lower, it may make a difference in terms of his deportation. For instance, if he didn't receive a prison sentence, if it was lowered the way I've suggested, he would not, perhaps not at any rate, get even a prison sentence. And that may make a difference to his deportation proceedings. Well, I calculated it. And if you don't take the enhancements for the amount of the loss or obstruction of justice, it would reduce the sentence from 10 to 16 to 2 to 8 months. So that you would have to assume that he didn't get the 8 months. I'm sorry. I had that figured out right here. The justice defense level is 10 if you use the enhancements. It's 6 if you don't. The criminal history is agreed to 3. No, Your Honor. That's where I think you're mistaken, at least in my argument. My argument is the criminal history is not 3. The criminal history is 1, which would reduce. Where is that in the record? I've just indicated to you that the only way you can get the criminal history up to 3 is to find that the prior conviction was one where there was 60-day sentence, was committed within 2 years of the present defense, and was committed while he was on probation for that prior conviction, and that the prior conviction occurred within 10 years of the present defense. All facts beyond the mere fact of a prior conviction. If I'm correct, then he's Category 1, and that brings him, as I see right here, 0 to 6 months. And he could get 0. He could get 0. And my point is if he got 0 sentence, if he was resentenced in no time, particularly, actually, be practical in light of the fact that he's already spent this time, it may mean a great deal of difference to him, his wife, and his family. So it does make a practical difference. Thank you. Thank you, Your Honors. I hope you'll allow me two minutes to revise. May it please the Court. My name is Elise Becker. I'm an Assistant United States Attorney here in the Northern District of California here on behalf of the United States. Good afternoon, Your Honors. I'll start with Mr. Weiner's last argument first addressing the sentencing issues. With respect to the enhancements or what moved the defendant from being in a criminal history Category 1 to criminal history Category 3, all related to his prior conviction, there was no dispute at sentencing as to that prior conviction or the sentence that was imposed on the prior conviction. The question at sentencing was whether or not the Court was properly interpreting the sentencing guidelines as to what was the definition of a prior sentence of imprisonment. That is true as well with respect to the other enhancements that were applied in this case, obstruction of justice and the loss announced. At sentencing, the defendant did not dispute the amounts that were charged to the two credit cards involved in his case. He disputed whether or not the government should have mitigated the loss on the second credit card because the government recovered the stolen property since they were caught in the act literally at the 10-Fran shopping center with the stolen merchandise. But again, he didn't dispute what the actual amounts were, and the Court did not make any independent factual determination by preponderance of the evidence or any other standard. The Court used the facts that were proven beyond a reasonable doubt at trial and that were otherwise conceded by the defendant at sentencing in reaching the sentence. Therefore, I submit that there is no Blakely or Ameline issue in this case in his sentence. With respect to the defendant's other arguments about Mr. E.R. Cogan's testimony at trial, there was, in fact, ample evidence presented to the jury about the scope of Mr. Cogan's criminal conduct. It was fully considered by the jury, and there was also ample sufficient evidence to convict Mr. Moiseev regardless of Mr. Cogan's testimony. If the jury completely disregarded everything that Mr. Cogan had to say, which I suspect is, in fact, what happened in this case, there was sufficient evidence to support the verdict. First of all, with the ---- Just leave him off the stand. Just leave him off. I'm sorry? Leave him off. I'm sorry. I couldn't hear. Why did you put him on then? Well, the government put him on as our first witness, certainly anticipating that he was going to be a strong government witness, and that was every impression we had prior to trial. But did the government make available to defense counsel all this Brady information? The government made available to defense counsel everything except for what was submitted ex parte and in limine to the trial court. There were boxes of discovery in this case. All the defendants were initially charged with a conspiracy with a much ---- which went from the first incident right before the vane trip card in 98 through 2000. And there were hundreds of pages. Tell me what the defendant didn't get. I don't understand where this procedure comes from to give the judge Brady materials. Brady says you give Brady materials, his complimentary materials to the defense. Where does this procedure come from? Or you give it to the judge? Your Honor, the documents were submitted under seal in this case because they related to various informants who were providing information to different agencies. In addition ---- How were they submitted to the district court? Your Honor? Yes. Did you give them a box of documents? Did they say, look, this might be exculpatory, this might be exculpatory? Did they discuss the Marat evidence? Your Honor, at the time, it was not a box worth of evidence. It was a relatively small submission. Did the submission to the district judge discuss the possible exculpatory significance of various materials? I believe that the submission to the judge identified what the records were and the government's reasoning as to why they would not be Brady material. And again, the government's theory at the time ---- Well, but did the judge have all that material in chambers? The evidence that has been attached as excerpts of records here, yes, were all presented to the court. And the court reviewed these ---- All these boxes and stuff that you wanted him to consider, were those in chambers? I'm sorry, Your Honor. The only information that we asked the judge to consider ex parte is, in fact, what's attached to the excerpts of records at this time.  I'm sorry. Mr. Weiner has attached them as excerpts of records 36 through 41, I believe. This is ---- Actually, that would be the court's order. The excerpts in the various reports that we're referring to are records 62 through 85. Was it actually through 85 or 62, 63, 64, 65, and jumps to 83, 84, and 85? Yes, Your Honor, that's how ---- Where is the government's brief explaining what these things are? If I may look through the record, Your Honor. Would it be fair to say that what we're talking about is not boxes of information, it's reports, and some of them are as brief as two pages? Your Honor, the boxes that I was referring to previously were the discovery that was produced at least a year before this trial. I'm talking about the Brady material that the defendant says that the defendant is limited to some reports, some of them as short as two pages. Is that true? Yes, Your Honor. Yes. Okay. The government's submission ---- Well, it did show his association with Murat, which he denied at trial, which the defense counsel didn't know because he was given these materials, but the government did know. That is correct, Your Honor. The government doesn't point out, you know, government doesn't provide this evidence to the defense, provides it to the judge. The judge doesn't remember when Kogan lies on the stand, and the government chooses not to point this out. It has materials which has withheld from defendant, which shows that Kogan is lying about Murat, and it doesn't say anything about it. Your Honor, at the time of the trial, I must admit that the government did not recall what all of these documents were that had been submitted. We don't know whether it recalled or not. We know that it didn't do it. Well, Your Honor, I, in fact, co-tried this case, so I do recall that we ---- Are you testifying, counsel? I'm sorry? Are you testifying? Are you on the oath? Your Honor, I just mean ---- Is this on the record? All we know is the government did not point this out. That's correct, Your Honor. Are you being a witness? Do you want to take the stand, or are you going to let counsel cross-examine you? Your Honor, I just mean to indicate that I did try this case, and, therefore, I'm just trying to explain to Your Honors that you're correct. I'm going to interject facts in the record about why the government didn't. Okay? That's something that's in your head. It's a piece of historical evidence, which you have every reason to try to paint in the most favorable light possible to your performance at trial. But you can't introduce facts here by telling us what you thought and what you didn't think. The fact is, the record reflects that the witness gets on the stand, says he has no association with this person, that the government knew he did because it provided evidence to district court. It chose not to provide that evidence to defense counsel, so defense counsel couldn't catch him on the lie. The government, both lawyers that are at trial, don't stand up and say, you're lying. So the jury is left with this misstatement. It's just one, just one of a number, right? Your Honor, yes, I understand. This is, you know, you do not prove it's an annoyance, and the duty of the government not to let witnesses lie at trial? Yes, Your Honor, I'm well aware of that. Well, what did the government do specifically to correct, using the term very loosely, correct the record so that the jury would be aware that this guy Kogan is a bad apple? What specifically did they do? Your Honor, I would like to direct you to a few facts that came out during the course of the trial. First, the government does interpret the stipulations that were entered into by the parties at trial as putting before the jury the scope of Mr. Kogan's criminal activity and his involvement. He ---- What about the evidence about sources he had for other credit cards that the government had, didn't disclose to the defense counsel? With respect to Mr. Novell, Your Honor, in fact, the defense called Alex Novell at trial, and he did testify that Mr. Kogan had approached him back in 1996 on several occasions. It would appear to have, in order to obtain credit card information, Mr. Novell, I believe, testified that he submitted reports suggesting that he had clients who ---- wealthy clients who were interested in obtaining a mortgage. And the ---- But Kogan himself had access to credit cards. Didn't he work for some ---- The record was that he had worked for various car dealerships, if that's what Your Honor is referring to. That's right. That would have access to it. And in the past, yes. Did that come out? That he had worked for car dealerships. And that he, therefore, had access to these other credit cards? He did not rely on myself? The record, I do believe, came out that he worked for car dealerships, and I would have to check as to whether or not he stated that he had access to credit card information or social security information while working at the car dealerships. What, again, what did the government specifically do to tell the jury that this guy is probably a liar? The government first entered into stipulations with the defense as to what the amount that the loss in Mr. Kogan's case exceeded the amount of restitution that Mr. Kogan was entitled to. And as well, Mr. Kogan had admitted that he had pled guilty to the charges in his case, which were conspiracy to use stolen credit cards with two other people, the act of stealing mail, and the unlawful use of a number of credit cards. In addition to those stipulations, the government also called Postal Inspector Robert Dorch, who testified that he followed Mr. Kogan and Mr. Sergei Bokov about four to five times a week for the six-month period of time that Mr. Bokov was working with Mr. Kogan, observing the ---- What about this hundreds of credit cards business? Your Honor, that ---- The government argues to the district court at sentencing Kogan that this guy had access and actually used and misused hundreds of credit cards. The government ---- Did that come out at Moser's trial? The scope and the number of credit cards did not come out at Mr. Moiseev's trial. No, Your Honor. Mr. Kogan ---- What difference does it make whether there were 10 or 100 or 500, except as to maybe as to the sentence, as to guilt? It was an issue at Mr. Kogan's sentencing because he was minimizing his conduct in order to not get enhancements for role in the offense. No. As far as this defendant is concerned in this case, what difference does it make how many credit cards Kogan was dealing with? Your Honor, I don't believe that it made a material difference in this case. It was significant ---- Oh, you think that if the jury thought that the guy on the stand pointing the finger at the defendant was the big cheese that had the hundreds of cards, that wouldn't have made a difference? Is that the government's position? Your Honor, I submit that the jury wasn't ---- You're not going to fall for that, are you? Your Honor, I submit that the jury was well aware that Mr. Kogan was involved ---- Hundreds of credit cards? I'm sorry. He was aware that he was ---- he had been involved with hundreds of credit cards? Well, Mr. Dorch is testifying that he observed them ---- Question. Yes or no? Was it aware that he was ---- that he had defrauded on hundreds of credit cards, each several thousand dollars, millions of dollars of fraud, credit card fraud? There was aware of that? The number of cards, no, Your Honor, was not ever put before the jury. Or that if you multiplied out the amount of loss per card times hundreds of cards, that he was involved with millions of dollars of fraud. Would that come out to the jury? There was no testimony before the jury as to how much ---- Why didn't defense counsel have all this information? Why wasn't it given to defense counsel? That information, Your Honor, was in the boxes of documents that had been turned over at least a year before the trial. But again, all of that ---- Turned over to whom? To the defense. There were four defendants in all these cases, and everybody received documents relating to all the uses of credit cards. The government, shortly before trial, dismissed the conspiracy count. But when the conspiracy count was still standing, presumably that evidence still applied to the conspiracy count and it was turned over. Well, they had everything except those exhibits that the numbers I just gave, right? Exactly. Exactly. They knew that Kogan was a crook dealing in credit cards. They knew that ---- They just didn't know how much. Is that a fair statement? That's possible. I don't know whether or not they calculated what losses were attributed to all the other credit cards that were in the documents. They knew he was a crook. Yes, Your Honor. They knew he was dealing credit cards. Yes, Your Honor. And I submit that the jury knew that as well. The government in its rebuttal argument ---- But they didn't know he had access to credit cards from other than ---- I mean, he could be a crook in one of two ways. One of them would be to get his credit cards from Moiseff, from the defendant here. He'd still be a crook. Or he could be a guy who is dealing in these things and, you know, he's the big guy who is engaged in this big fraud of credit cards and he has every reason to point the finger at Moiseff in order to minimize what's otherwise going to be a hefty sentence for him. Mr. Kogan admitted that he was the one who was stealing the credit card and he never attributed the theft of the Vayntrup card to Mr. Moiseff. And Mr. Kogan, in fact, ended up admitting that he was incapable of figuring out how to gain the information he needed to activate the cards on his own, which is why he was paying a tremendous amount of money to Mr. Moiseff in order to obtain Social Security numbers to activate the stolen cards until somebody, Vadim Kaplun, sold him the 1-800 number to BioSearch Backcheck and he was then able to access the information himself to activate his cards. But he never, I don't believe, testified that Mr. Moiseff was the one who stole this card. He admitted that he was the one he stole this card and he admitted in his plea agreement that, in fact, he was in the business of stealing credit cards out of mailboxes and he described how he went about it. I ask you this. Was defense counsel made aware that the judge had these various pieces of paper in chambers that what was the judge asked to do? The judge was asked to review the documents to determine whether or not any of the materials contained herein had to be turned over pursuant to Brady. And, in fact, counsel for Mr. Moiseff at trial, Mr. Dennis Roberts, was served with the United States ex parte in-camera submission and motion to seal. So, yes, they were made aware that this took place. The court reviewed the materials. How would the judge ever figure out what was Brady material and what wasn't, unless he understood the whole case? Well, for example, there are some of the documents relate to Mr. Bokoff, who was the C.I., who was not a government witness at trial. We had already identified that we were not calling him. A picture of him with his wife, I'd argue to say, is not exculpatory information of Mr. Moiseff. It's not impeachment of Mr. Kogan. And Mr. Bokoff didn't testify. There were some, certainly some documents that were submitted that I don't believe were exculpatory or impeachment material. Some other documents, the court ordered portions of the records to be turned over. And clearly, as Your Honor has indicated, the information with respect to Murat having that Mr. Kogan stated that he was working with R.E.M. No, I've done that. I've had piles of this stuff brought to me when I was on the trial court. And I remember I'd look at this. And I wouldn't know what was exculpatory and what wasn't. I wouldn't know what could be used to cross-examine, you know, a government witness or what wasn't. And what I would have the defense lawyers do is to give me a list. They knew the case. Tell me what you would like me to look for. I'll look at everything. But tell me what you'd like me to look for. That's the only way you can know. That does not take place here, Your Honor. What's exculpatory and what isn't. You can see something that looks very innocent, like a picture. Well, what has this got to do with the case? And it could be important. So do any of these documents that they claim have anything to do with guilt as distinguished from credibility? Do they have anything to do other than going over? The documents that were reviewed under seal, all those documents, the question raised by defense is whether it in some way affects the credibility. It doesn't affect the guilt of the defendant. Is that correct? It goes towards Mr. Kogan's credibility. And that's the only reason it's important. I believe so, if I understand the argument correctly, that it does. But if he is disbelieved, the jury could have acquitted. So it goes to Kogan's credibility, but it goes to Moysev's guilt. Exactly, Your Honor. And, in fact, that's how they are attacking both the Mr. Kogan's trial testimony as well as these documents that were submitted. I mean, there wasn't much other than Kogan's testimony. I mean, without Kogan's testimony. What about Gallegos? Well, with respect to the Vayntrub card, which was the card in 1998, Kate Gallegos testified that she recognized Mr. Moysev's voice on the telephone because she had been interacting with him for a couple of years, that the phone number from which he called to purchase the Vayntrub personal information, the social security number, was called from Mr. Moysev's telephone. And Mr. Moysev stipulated that, in fact, that was his telephone. In addition, Ms. Gallegos identified another reason why she recognized Mr. Moysev, going back to her first interactions with him when he paid by an American Express card. And the defense stipulated that that American Express card had belonged to Mr. Moysev. The defendant also stipulated, my recollection is correct, that the American Express card had never been stolen or used fraudulently. And I don't believe there's anything in the record to support the theory that somebody else had taken or was using his telephone at his house or had stolen his credit card back in 1996 when he first established contact with BioSearch and BackCheck. The ---- What about the limitation on cross-examination of the two witnesses about the Kogan and Ion? Ms. Goldenstein? Goldenstein, yes. About the exposure they faced in terms of what punishment they would receive. Your Honor, the government submits that the court properly exercised her discretion in limiting the scope of the cross-examination. The ---- both witnesses admitted what that ---- First, Mr. Kogan admitted that he had pled guilty to the charges in this offense. And through the stipulation, it was brought out that he certainly was testifying with the expectation that he would get a 5K1.1 downward departure motion in his case that would affect what his ultimate sentence was going to be. And again, it was quite clear from the stipulation that the amount of loss that he was facing was much more significant than these two limited credit cards in this particular case. There was a much greater scope of his involvement. With respect to Ms. Goldenstein, she was in a pretrial diversion program, which was, therefore, slightly different from Mr. Kogan. The judge also gave jury instructions to evaluate Mr. Kogan. Why wouldn't that have been of great interest to the jury in evaluating the credibility, knowing whether the degree to which they were exposed to punishment and how much they were saving themselves, potentially, by testifying for the government? The fact that Ms. Goldenstein didn't even get charged strikes me as pretty significant. Yes, Your Honor, and I believe ---- She was in a diversion program. I mean, this is the kind of thing that ---- I mean, that's the kind of sweetheart deal that the jury might find quite impressive in deciding that she had more than to lie. Your Honor, the penalties really were an issue for Mr. Kogan since he was charged. And the pretrial diversion, I believe, was brought out with respect to Ms. Goldenstein, but we never discussed what the maximum penalty was for a violation of 18 U.S.C. 1029a2. And as the case is ---- some cases will support the proposition that there is some prejudice that may ensue to the defendant actually at trial if the jury is apprised of what the maximum penalties are for the offense. If he's the one who wanted to get into it, then he's waived that prejudice. So that prejudice is not something that can count in favor of the government keeping the evidence out. That's his choice to make. Why would the government object to something like this? The government ---- the government could object. It didn't want the jury to know that these people were really up against very stiff punishments, and they were doing everything to save themselves and had every reason to lie and point the finger at this defendant. Was the ruling in part a 403 ruling to keep out the evidence of punishment? The 403 ruling, I don't think the Court explicitly made a record that she was excluding it under Rule 403 with respect to the ---- What would be the 403 balancing anyway? What would be the undue prejudice? Who would be unduly prejudiced? I understand the probative value, but how ---- who would be unduly prejudiced? Where does that other part of the equation come from? If the Court had evaluated it under Rule 403, I think the Court could have found that the defendant could, in fact, be prejudiced by having the jury advise ---- Prejudice against the defendant doesn't count, because he is the one trying to admit it. So the Court can't say I'm excluding the evidence because it might prejudice you. So I'm not going to put it on because it might prejudice you. That doesn't work. I mean, that doesn't stand straight-faced. So what is the unfair prejudice to the government in having a jury know just what incentives the witnesses have to lie, how big the incentives are, how badly they need to curry favor with the government in order to avoid a terrible fate? What is the unfair prejudice of the government from that? There is the possibility, of course, that the jury would nullify its verdict in the case if they were apprised of maximum penalties. I'm sorry. How is that? If a jury, if a juror or the jury entirely decides that the penalties are too harsh or shouldn't be imposed against the defendants, there was at least one case that found that that could be a valid concern. But this would be the ---- this would be the punishment faced by the witnesses, not by defendant. This is not talking about defendant's punishment. This is talking about what is a possible punishment that could be suffered by the witnesses. This is the incentive. You know, this gives the jury a chance to understand just how badly they have a reason to lie. It would give an additional factor for the jury to consider in evaluating Mr. Kogan and Ms. Goldenstein's testimony. However, the bulk of their agreements were before the jury, and the jury had every reason to judge with great caution the credibility of both witnesses, and were so instructed. So it is the only remaining factor that was not brought out of their plea agreements or their other agreements with the government. But what was the basis for excluding it? I mean, was it cumulative oppression? I mean, what ---- I understand what is the justification. Normally, probative evidence is admitted. Defendant is allowed to present evidence that's helpful to the defense. This is how our system works. Unless you find a reason justifiably in law for excluding it. What was the reason here? Well, I'm hesitant to answer so that I don't appear that I'm testifying before Your Honor. Let me help you out. Well, I'm not asking you to tell me what's in your mind. I'm asking you what is the reason in the record. So I certainly do not want you to be testifying. I want you to tell me what it is in the record that justifies this. You know, if it's not in the record, I don't care what's in your mind. I believe that it was that it would prejudice the defendant, Your Honor, by having the maximum penalty. Well, that is an error, isn't it? That is an error. Weighing prejudice against the proffering party as part of the 403 balancing is just an error of law. You can say it's unfair prejudice to the party, to the opposing party. But to say, oh, I'm not going to let you admit it because it's unfairly prejudiced against you, that's beyond silly. I mean, that doesn't seem to me. The reason they do that is that they don't like the juries to know what's really going on in the world. They don't like them to know what the punishments are. Isn't that it? Well, isn't there an instruction in Ninth Circuit Instruction 7.4 that instructs the jury that it may not consider punishment in deciding a case? And did you argue that this is a backdoor way of getting the information in before the jury by finding out what co-defendant or people in the same boat are going to get? Then the jury will find out what the punishment is in this case. Yes, Your Honor. That's the reason, right? In fact, that instruction was given. That is a reason to support not. What is that? Have you got a copy of that instruction? Of the jury instructions? Yeah. Yes. Model instruction 7.4. Well, why couldn't the instruction, why wouldn't the instruction take care of it? Let her just read it. I like to hear this one. If I may have a minute to find it, Your Honor. If the jury is instructed that it can't consider it in determining the guilt of the defendant, then there you are. You know, the jury is told it can consider it for purposes of determining the witness, the bias of the witness, but not the guilt of the defendant. What's your prejudice there? You do have an instruction telling the jury exactly that. What's the instruction say? I'm trying to find it, Your Honor. I apologize. It doesn't say that what the punishment shall be is solely a matter for the court to decide or something like that? I found it, Your Honor. It's on Reporters' Transcript, page 865, from Tuesday, April 29th, 2003. Now, the punishment provided by law for this crime is for the court to decide. You may not consider punishment in deciding whether the United States has proved its case against the defendant beyond a reasonable doubt. Okay, but that's not true, is it? I mean, that's really a lie. I'm sorry? Well, punishment is not for the court to decide. I mean, who decides what the punishment is? The U.S. Attorney's Office does on how they charge a case. And then the judge's discretion is limited pretty narrowly. That is an official model instruction from the Ninth Circuit, correct? That is, Your Honor, yes. Yeah, but also down in the ‑‑ I know I've seen some where judges orient grand juries, and they tell the grand jury that, well, I've seen them where they introduce the prosecutors and the agent and say, these are very honorable, wonderful Americans, and you can rely on them. And then they're told that they shouldn't consider punishment because this is something solely within the province of the court. But that isn't true, either, is it? The government does have discretion. More significant, I don't see how this helps you here at all. The instruction tells the jury that in deciding the guilt of the defendant, they can't consider punishment. So what possible prejudice, given this instruction, presumed jury's following instructions, is there to the government in letting them know what punishment the witnesses would suffer and what reason they would have, what cause they would have to lie? We have an instruction. It tells the jury you can't consider that determining guilt. But you worry about nullification, right? That is a concern, Your Honor. And that issue was decided at Gettysburg, wasn't it? But we presume in this circuit, maybe Gettysburg is different, but in this circuit, we presume the jury's following instructions. Yes, Your Honor. That's the law of the circuit. We presume jury's following instructions and we know that we can tell them what the punishment will be suffered by these witnesses and we instruct them not to consider determining the guilt of the defendant and we presume they follow it. The fact that there is a standard jury. At Gettysburg, the issue that was decided there was correctly decided. It's the sentencing guidelines that mucked it all up. That's what the South was always talking about, right? Nullification, nullification. Let me specifically ask, did you argue that the reason you didn't want this evidence to go in was that this was a manner, a method of the defense to get before the jury the information as to what the punishment was? Your Honor, the record is very, very brief on this point and does not fully explore all of the reasons why the evidence was not allowed at trial. The court simply ruled that, in fact, the penalties would not come in. And in light of the standard jury instruction, which we had already decided was going to be given, that the jury was not to consider what the sentence was, the government submits that the trial court did not abuse her discretion in limiting the cross-examination with respect to the maximum penalties when the bulk of the plea agreement otherwise came in. And it was clear to the jury that Mr. Kochan. It was stipulation, not the plea agreement. Stipulation. Tell us exactly what the stipulation said, or put it another way around. Is it true that the stipulation told an awful lot and the only thing it didn't allow was the punishment? Is that a fair statement? This is a 5K stipulation. I'm sorry, Your Honor. This is a 5K stipulation. It was a stipulation with respect to loss, restitution, and downward departure under 5K. And it was. But it didn't tell them how far down it was. Exactly. You know, they could have been talking about six months, so this is three months. That's correct, Your Honor. They didn't talk about hundreds of cards and millions of dollars of, I mean, you know, this jury had no idea who this Kogan was the way the government did. The government knew darn well that this was somebody who was a huge misuser of credit cards and that faced a tremendous amount of punishment and a huge amount of restitution. It didn't bring that out in front of the jury. It put him on the stand and didn't bring it out in front of the jury. Well, the government didn't. Well, why does this make him a little guy pointing a finger at this defendant? The government didn't present Mr. Kogan as a little guy versus Mr. Moisey or anybody else. And, in fact, Mr. Kogan was asked about his plea agreement that he pled guilty to all the charges with which he had been indicted, which included conspiracy to use credit cards. What was his sentence? His ultimate sentence was 12 months, Your Honor. And how about Moisey? What was his sentence? Ten months. Ten months. So the bad guy got two more months. That's correct. All right. You know, some way we've got to bring this to a head. We've got to end this sometime. You're arguing. Oh, submitted to you sometime? I was just looking for the stipulation, but I'm happy to. Well, yeah. Would you like that, Your Honor? Yeah. Oh, thank you. Thanks. On the reporter's transcript 307, the stipulation reads as follows. As part of Igor Kogan's plea agreement with the government, he agreed that the court may order and he will pay restitution in the amount of $45,966.76. The parties agreed that the amount of loss attributed to the credit card theft scheme that he was involved in was in excess of the amount of restitution that was just stated to you. The parties also stipulate that as part of Mr. Kogan's plea agreement with the government, the government agreed that if within its sole and exclusive judgment the government decides, meaning Mr. Kogan has cooperated truthfully and fully provided substantial assistance within the meaning of the United States Sentencing Guidelines, Section 5K1.1, and otherwise complied fully with this agreement, the plea agreement, it will file with the court a motion under Section 5K1.1 and or 18 United States Code, Section 3553, that explains the nature and extent of the defendant's cooperation and recommends a downward departure. The parties agree that a downward departure is a sentence that is lower than that required by the sentencing guidelines, which are the rules passed by Congress that dictates sentences in federal cases. What about Goldenstein? I'm sorry, Your Honor? What about Goldenstein? We did not have a stipulation, I don't believe, with respect to Ms. Goldenstein. There was significant discussion outside the presence of the jury regarding her pretrial diversion agreement, and that all related in principle to her need to have an attorney present while she testified at trial. But, in fact, Mr. Roberts, on cross-examination of Ms. Goldenstein, pretty much went through every requirement that she had on pretrial diversion and brought out, in fact, her failure to comply with almost every condition of her pretrial diversion. And she, again, Mr. Roberts very successfully impeached both Mr. Kogan and Ms. Goldenstein that certainly with respect to Mr. Kogan, there, I believe that the record would support that there was little credibility left to him at the conclusion of his cross-examination. I've far exceeded my time, so if there are no other questions, then I'll submit it. Thank you. All right. Thanks. Your Honor, I don't want to belabor the point. I know this has been so very long for you. I'd just like to mention a couple of things. I must tell you, both your client and Mr. Weisshoff, Mr. Weisshoff, Kogan got gifts from heaven, 10 months and 12 months. They did pretty well. Yes. In terms of punishment. That's right. That's basically because my client's criminal history was rather low. I think that's true. And I think also the government actually said in its papers that it would have brought a perjury charge against Kogan and would have asked for an obstruction of justice enhancement if it had the transcript right there at the time of his sentencing. It asked that he not get acceptance for responsibility, but the district court judge actually gave him that. And that gave him the 12 months. So that's true. I think he did very, very well under the circumstances. I would like to answer, if I could, Judge Rose, one question you asked is, was there anything in the submission, the ex parte submission. Take that microphone. Was there anything in, pardon me, Your Honor, the ex parte submission by the government to the district court judge that the defense didn't know about that was hidden that exculpated Moiseff? And the answer is yes. You might recall, again, that one of the documents indicated that Kogan invited Volov, V-O-L-O-V, these are all these Russian people in the Bay Area, to go stealing with him. To go stealing with him? To go stealing credit cards and shopping with him. That's literally stealing, I'm afraid. And that was about two months prior to when he supposedly has my client as his partner. And at trial he testified that my client was his partner for six months. So that goes against the idea that my client was his partner, not just for six months, that my client was even his partner. Was there evidence to suggest that he only had one partner? He said he only had two. Bokov, who was the paid government informant, and my client. There's now evidence to show that he had at least four. Bokov, if you believe him, my client, and I don't believe that, and these two other persons that the defense lawyer didn't know anything about. Maybe they were limited partners. I think maybe that's true. I think it's getting late, so I'll sit down. But thank you all very much. I appreciate it. You got your brief there? Yes, I do, Your Honor. Okay, open up to page 1. Page, pardon me? Top page 1. Just page 1? Yeah, just page 1. Okay, you familiar with Federal Rule of Appellate Procedure 32? I'm sorry, Judge, I can't hear you. Federal Rule of Appellate Procedure 32. Typeface. Federal Rule of Appellate Procedure 32 says you're supposed to use a 14-point serif type. Do you understand what a serif type is? No, I don't, Your Honor. Well, you should read the rule. You know, I have read that rule. We've been doing this for years. I always think this is 14-point. I'm sorry if it's not the font. Is that what you're suggesting? A proportionate space phrase must include serifs. I don't even know what... And then the... If you don't know what serifs are, you can read the comments to the rule. Serifs are those little crossbars at the bottom of tops of letters. Okay? Also, you look at that footnote? Also... The footnote. What about the footnote, Judge? Look at the footnote. Yes. Is that 14-point type? Oh, of course not. I'm sure it's not. No, it's not. Now, if you read the Advisory Committee rules on the Ninth Circuit rule, it says quite clearly, there's no exception for footnotes. I apologize for this. Do you want to in the future comply with Rule 32? I definitely will, Your Honor. Thank you for pointing it out. Because notice you have a certification of them that you have complied. I have signed that certification and understood that I was in compliance because it's 14-point. I'm sure it was not intentional, but I'm sure that you will not do so in the future. You can be guaranteed of that, Judge. Thank you very much. That's a serif? I thought that was Omar's serif. I think that's what I thought, too, Judge. That's his cousin. All right. Well, okay. Oh, the last matter is submitted. And the Court will recess until 9 a.m. tomorrow morning. That's the William Leon Cassidy matter. Your Honor. Oh, he should just wait there. This Court will recess until 9 a.m. tomorrow morning. Thank you.
judges: Pregerson, Kozinski, Rhoades